IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| THERESA KIMES, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR HER MINOR DAUGHTER R.K.; AND R.K., MINOR CHILD;<br><br>Plaintiffs,<br><br>vs.<br><br>KATHRYN MATAYOSHI, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT OF THE STATE OF HAWAII DEPARTMENT OF EDUCATION; NICOLE CARLSON; BART NAKAMOTO; PETER TOVEY, JOHN DOES 1-10,<br><br>Defendants. | CIV. NO. 16-00264 JMS-RLP<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS KATHRYN MATAYOSHI, NICOLE CARLSON, BART NAKAMOTO, AND PETER TOVEY'S MOTION FOR SUMMARY JUDGMENT, ECF NO. 29 |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS KATHRYN MATAYOSHI, NICOLE CARLSON, BART NAKAMOTO, AND PETER TOVEY'S MOTION FOR SUMMARY JUDGMENT, ECF NO. 29**

## I. INTRODUCTION

Plaintiff Theresa Kimes ("Kimes"), individually and on behalf of her minor daughter R.K., (collectively "Plaintiffs") filed this action against Kathryn Matayoshi, Superintendent of the State of Hawaii Department of Education, Bart

Nakamoto, Peter Tovey, and Nicole Carlson, principal, vice principal, and special education teacher, respectively, at Mokulele Elementary School (collectively "Defendants"). Compl. ¶¶ 1-5, ECF No. 1. Plaintiffs allege that defendant Matayoshi violated § 504 of the Rehabilitation Act in her official capacity. *Id*. ¶¶ 2, 48. As to the remaining defendants, Plaintiffs allege that they violated § 504 of the Rehabilitation Act in their official and unofficial capacities, that they negligently caused Kimes and R.K. to suffer emotional distress, and that defendants Nakamoto and Tovey committed assault and battery against R.K.. *Id*. ¶¶ 48, 51, 54, 57. Before the court is Defendants' Motion for Summary Judgment as to all claims. ECF No. 29. The motion is DENIED as to the allegation in count one of the complaint against defendant Matayoshi—violation of § 504 in her official capacity; the motion is GRANTED as to all other defendants and all other counts.

## II. BACKGROUND

### A. General Factual Background

R.K. has multiple health and behavioral challenges, including autism spectrum disorder and epilepsy. Compl. ¶ 9. As a result, she has received special-education services since the age of two, and she requires both a nurse and skills trainer to accompany her at school. *Id*. ¶¶ 8, 13. Beginning in October 2012, R.K. attended Trumpet Academy ("Trumpet"), a school run by Trumpet Behavioral

2

Health, which was under contract with the Hawaii Department of Education ("HDOE") to provide educational services to students with special needs. *Id.* ¶ 12; Ebisui Dep. 9:15-22, June 26, 2017, ECF No. 49-11. Trumpet's contract with HDOE ended in the summer of 2016. *Id.* 36:25; Compl. ¶ 12. In the fall of 2015, R.K. began to transition to Mokulele Elementary School ("Mokulele"), where eventually she was to be placed in a special education classroom. Compl. ¶ 12. The transition was to happen gradually, with a projected completion date in late March, 2016. Pl.'s Concise Statement of Material Facts ("CSMF") Ex. 4, ECF No. 49-7. By March 10, the date of the incident giving rise to this lawsuit, R.K. was spending two days a week at Mokulele and the remainder of her time at Trumpet. Def.'s CSMF ¶ 5, ECF No. 30; Pl.'s CSMF at 2.

R.K.'s challenging behaviors include aggression (hitting, scratching, biting, and kicking), self-injury (particularly punching herself in the nose and legs and biting herself), verbal threats, and the use of profanity. Def.'s CSMF ¶ 7; Pl.'s CSMF at 2. Cheryl Ebisui, a senior clinician for Trumpet Behavioral Health, former administrator at Trumpet Academy, and R.K.'s behavioral specialist at Trumpet, describes these behaviors as primarily attention seeking, explaining that R.K. will "act out in order to receive negative attention from people, because that is reinforcing to her." Ebisui Resume, ECF No. 40-9; Ebisui Dep. 9:15- 10:23, 16:17-18, 19:18-21. As a result, Ebisui and the staff at Trumpet reduced the

3

amount of attention R.K. would receive for engaging in such behavior. Ebisui Dep. 19:18-23. One strategy for doing so was to avoid physically restraining R.K., unless she was in physical danger herself or was a danger to others. *Id*. 19:24-21:11. Another strategy was to encourage R.K. to take short breaks away from her learning environment so that she could calm and refocus herself when she became frustrated, rather than "acting out in order to escape work." *Id*. 22:1-18.

Trumpet's Positive Behavior Support Plan Protocol, which was prepared in September 2015 and updated in February 2016 included instructions on how to react to R.K.'s verbally or physically aggressive behavior. Pl.'s CSMF Ex. 5, ECF No. 49-8. It provided that "negative attention in the form of reprimands" should not be used, and stated that if her behavior became aggressive towards others, "CPI approved block and move procedures" should be used, noting "at this time [R.K.'s] intensity of aggression at [Trumpet] does not warrant the use of restraint, especially when the function of her behavior is attention seeking." *Id*. It further instructed that, if R.K. was not in her designated work area when the behavior occurred, staff should "NOT utilize CPI two-man transport to move her anywhere else, as this [would] reinforce the behaviors by providing the negative attention she is seeking." *Id*. Finally, the protocol provided that "[a]ny attention given to . . . self-injurious behaviors and attempts should be kept to a minimum." *Id*.

Trumpet's Crisis Plan for the 2015-2016 school year included the following directions:

> If [R.K.] swears or engages in verbal threats for more than 5 minutes, begin clearing out the middle classroom of other students and items (this includes [R.K.'s] desk, chairs, and work materials.)
>
> If [R.K.'s] outburst continues to escalate into aggression towards other students/staff, utilize CPI [Crisis Prevention Institute] approved block and move procedures and ensure other students have been removed from the area. At this time, [R.K.'s] intensity of aggression at [Trumpet] does not require the use of restraint, especially when the function of her behavior is attention seeking. If [R.K.] is targeting a specific staff member, notify the supervisor on site to switch out temporarily.
>
> If the tantrum occurs at a time when [R.K.] is not in her designated work area, keep her where she is and clear the area. Do NOT utilize CPI two-man transport to move her anywhere else, as this will reinforce the behaviors by providing the negative attention she is seeking.
>
> Should [R.K.'s] level of self-injury draws blood (e.g. hits to her nose causing a nosebleed), provide her with a damp paper towel to wipe herself with. Do not provide any other form of attention until she is calm.
>
> [R.K.] is able to verbally indicate when she is calm by stating, "I'm ready".

Pl.'s CSMF Ex. 6, ECF No. 49-9. These plans were provided to Mokulele in anticipation of R.K.'s move to the school. Ebisui Dep. 18:16-18, 23:13-24:4.

On February 12, 2016, a meeting was held at Mokulele to discuss R.K.'s behavior support plan. Pl.'s CSMF Ex. 1, ECF No. 49-2. Kimes states in

5

her declaration that she had requested Trumpet staff be included in the meeting, but none attended. Kimes Decl. ¶¶ 8-13, ECF No. 49-1. She states that Trumpet staff told her they had received no notice or invitation to attend but that Mokulele staff insisted notices had been sent. *Id*. ¶¶ 10-12. Kimes further states that she did not agree to any changes to the behavior support plan Trumpet had been using and that "the topic of restraint was not discussed" at the meeting. *Id*. ¶¶ 14-15.

Following the meeting, Mokulele prepared a Functional Behavior Assessment and Behavior Support Plan. Pl.'s CSMF Ex. 1, ECF 49-2 at 1-2. The assessment identifies R.K.'s "problem behaviors" and it lists "actual consequences" for those behaviors as follows: "1. Counseled 2. Given think time 3. Restrained 4. Notify parents." *Id*. at 1. The Behavior Support Plan lists similar consequences for undesired behavior, but in a different order: "1. Use CPI techniques to restrain and calm 2. Redirect to task. 3. Counseled or Given think time 4. Notify parents." *Id*. at 2. Under "crisis plan," it states: "When [R.K.] is throwing items or hitting, or biting an adult, yelling, or swearing, she will be restrained. If her behaviors continue for over 30 minutes, parents will be called. If [R.K.] does not settle in a reasonable time, her parents will pick her up for the remainder of the day." *Id*.

Immediately following the March 10 incident described below, Mokulele's assessment and behavior support plans were modified to remove

6

references to restraint, stating instead that "CPI techniques [would be used] to help calm" and that R.K. would "be kept from hurting herself or others." Pl.'s CSMF Ex. 2, ECF No. 49-3.

**B.      March 10, 2016 Incident**

The parties disagree about the details of the events of March 10th. The following is a description of Plaintiffs' version of events as set out in their opposition to the motion for summary judgment, which version is supported by the declarations attached to Plaintiffs' Concise Statement.

R.K. left her classroom at Mokulele while being monitored by Chelsea Gilkey, R.K.'s nurse, and her teacher, defendant Carlson. Pl.'s Opp'n, ECF No. 48 at 3-4. R.K. went to an outdoor stairwell where, at some point, she attempted to climb over the railing. Id. But she then lay down in a safe position. Id. Defendants Nakamoto and Tovey "grabbed R.K. by the arms and dragged her down the staircase to a grassy area where R.K. began to engage in crying and self-harm." Id. They then "grab[bed]" R.K. by her arms and legs and carried her to the classroom, which "provoked [an] episode of crying, self-harm, bleeding, and wheezing." Id. In her declaration, Gilkey gives further details about restraint used once R.K. was returned to her classroom. Gilkey Decl. ¶¶ 10-21, ECF No. 49-4. And Ebisui opines that defendants' handling of R.K. as described was

7

inappropriate under the circumstances given her disabilities. Ebisui Dep. 34:2-35:11.

In her declaration, Kimes states that before the March 10 incident R.K. was "quick to bond with her therapists and teachers," that she was "comfortable and free to learn," and that R.K. "had been gaining skills and learning to become more independent as she trusted the people who were teaching her." Kimes Decl. ¶ 31. Kimes contends that R.K.'s behavior changed immediately after the incident, stating that R.K. began "isolating herself," pleading not to go to school, and appearing "more distrustful and challenging toward authority figures." *Id*. ¶ 32. Kimes states that R.K. has "required counseling with a psychiatrist to address her difficulty sleeping, anxiety, depression, and fear" and that she "continues to suffer the effects of the incident . . . in her (1) academic progress, (2) productive therapy sessions, (3) self-help skills acquisition, and (4) ability to make friends." *Id*. ¶¶ 33, 35.

Defendants deny grabbing and dragging R.K. Answer, ECF No. 11 at 4j. They admit that they restrained R.K. but contend that they acted appropriately to protect her. Reply at 5, ECF No. 41.

Following this incident, R.K.'s parents removed her from Mokulele. She returned to Trumpet until the school closed and now apparently attends Pearl Harbor Elementary. Ebisui Dep. 49:16-22; Compl. ¶ 42; Mot. at 6.

8

## C. Procedural Background

Plaintiffs filed their complaint on May 26, 2016. ECF No. 1. Defendants filed their Motion for Summary Judgment on April 26, 2017. ECF Nos. 29, 30. Plaintiffs filed an opposition to the motion on July 10, 2017. ECF Nos. 39, 40. And Defendants filed a Reply on July 17, 2017. ECF No. 42.

Following a July 27, 2017 status conference and based on the agreement of the parties, the court deemed the opposition, reply, and concise statement and declarations in support thereof withdrawn, and set a schedule for a new opposition and reply to be filed. ECF No. 44. Plaintiffs filed an opposition on August 25, 2017. ECF Nos. 48, 49. And Defendants filed their reply on September 15, 2017. ECF No. 50. A hearing was held on October 10, 2017.

## III. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden initially lies with the moving party to show that there is no genuine issue of material fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (quoting *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is material if the resolution of the factual dispute affects the outcome of the claim or defense under substantive law governing the case. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[. ]" *Celotex*, 477 U.S. at 323-24. "There is no genuine issue of fact if the party opposing the motion 'fails to make an adequate showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (quoting *Celotex*, 477 U.S. at 322). Moreover, there is no genuine issue of material fact if, taking the record as a whole, a rational trier of fact could not find in favor of the non-moving party. *Matsushita*, 475 U.S. at 586; *Taylor*, 880 F.2d at 1045.

# IV. ANALYSIS

Defendants contend that summary judgment should be entered in their favor on Plaintiffs' claims for violation of § 504 of the Rehabilitation Act because "there is no evidence that R.K. was excluded from participating in, denied the benefits or services of, or subject to discrimination at Mokulele solely by reason of her disability." Mot. at 12. They further contend that judgment in favor of Defendants other than Matayoshi on Plaintiffs' § 504 claims should be entered because claims against them in their official capacities are duplicative and claims against them in their individual capacities are improper. *Id*. at 10-11. Regarding Plaintiffs' remaining claims for assault and battery and negligent infliction of emotional distress, Defendants contend that judgment in their favor is warranted based on both a lack of evidence and application of the doctrine of qualified immunity. *Id*. at 12-18.

As explained below, the court finds material issues of fact exist as to whether defendant Matayoshi, in her official capacity, violated § 504 of the Rehabilitation Act, but it agrees that Plaintiffs' § 504 claims against the remaining defendants are either duplicative or prohibited under the Act. The court also agrees that defendants Nakamoto, Tovey, and Carlson are entitled qualified immunity on Plaintiffs' state tort claims and therefore does not address the merits of those claims.

## A. Section 504 Claim Against Superintendent Matayoshi

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(b)(2)(B). The Ninth Circuit has explained the "focus of the prohibition in § 504" is preventing the denial of "meaningful access to state-provided services" to disabled persons. *Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008) (internal quotation marks and citations omitted). And it has held that "although § 504 does not require substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals, it . . . does require reasonable modifications necessary to correct for instances in which qualified disabled people are prevented from enjoying meaningful access to a benefit because of their disability." *Id.* (internal quotation marks, emphasis, and citations omitted). Thus "[a] failure to provide reasonable accommodation can constitute discrimination under [§ ] 504." *Id.* (quoting *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002)). And "[i]f an organization that receives federal funds violates Rehabilitation Act § 504 intentionally or with deliberate indifference, it may be liable for compensatory damages." *Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010).

The Ninth Circuit has clarified that § 504 is broader than the Individuals with Disabilities in Education Act ("IDEA"), and regulations implementing § 504 that "require qualifying public schools to 'provide a free appropriate public education [FAPE] to each qualified handicapped person,'" although similar to those under IDEA, are not identical. *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1202 (9th Cir. 2016) (quoting 34 C.F.R. § 104.33(a) and citing *Lemahieu*, 513 F.3d at 929)). "[U]nlike FAPE under IDEA, FAPE under § 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met and focuses on the 'design' of a child's educational program." *Lemahieu*, 513 F.3d at 933. A § 504 FAPE must be "designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met." 34 C.F.R. § 104.33(b)(1). Further, "Implementation of an Individualized Education Program [IEP] developed in accordance with [IDEA] is one means of meeting the standard." 34 C.F.R. § 104.33(b)(2). But it is not the only means of meeting the standard; thus, a plaintiff "may not obtain damages simply by proving that the IDEA FAPE requirements were not met." *Lemahieu*, 513 F.3d at 933.

Under these standards, to prevail on their claims under § 504, Plaintiffs must prove the following: (1) [R.K.] is a qualified individual with a disability; (2) she was denied a reasonable accommodation that she needs in order

to enjoy meaningful access to the benefits of a public education; and (3) the HDOE receives federal financial assistance. *See Paradise Valley Sch. Dist. No. 69*, 815 F.3d at 1204; *Hamamoto*, 620 F.3d at 1097. To recover damages, Plaintiffs must also prove that the HDOE acted intentionally, either by showing a "discriminatory animus" or "deliberate indifference." *Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d at 1204; *Lemahieu*, 513 F.3d at 938. Defendants concede that R.K. is a qualifying individual and that the HDOE receives federal financial assistance. Mot. at 3. Therefore, the court need only consider whether Plaintiffs have provided sufficient evidence to raise a genuine issue of material fact as to second element and the *mens rea* requirement of their claim.

1. **Meaningful Access/Reasonable Accommodation**

Although Plaintiffs do not clearly delineate and/or distinguish their claims under § 504 itself and under 34 C.F.R. § 104.33(b)(1), Plaintiffs appear to contend that, as an accommodation to meaningfully access educational benefits, R.K. required handling consistent with the behavior support and crisis plans that had been used at Trumpet, that Mokulele's behavioral support plan was not designed to meet her needs, and that R.K. was denied an appropriate accommodation when Mokulele staff restrained R.K. on March 10. Opp'n. at 7-8.

Whether an accommodation is reasonable "depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of

the disabled individual's circumstances and the accommodations that might allow him [or her] to enjoy meaningful access to the program." *Hamamoto*, 620 F.3d at 1098 (quoting *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002)). The Ninth Circuit has recognized that "[t]he Rehabilitation Act creates a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary." *Id.* (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001)).

Here, Plaintiffs have provided evidence that the Mokulele staff failed to properly investigate R.K.'s needs regarding appropriate reaction to her behavioral issues by excluding Trumpet staff from the February 12 meeting and failing to discuss the use of restraint before designing Mokulele's behavioral support plan despite having received Trumpet's plans outlining R.K.'s special needs. Plaintiffs have also provided evidence that R.K. required this accommodation in order to benefit from her education. Both Ebisui and Kimes emphasize in their declarations the importance of refraining from using restraint as much as possible. And the uncontested fact that Trumpet's plans existed is evidence that the accommodation was feasible. Evidence from Gilkey, R.K.'s nurse and one-time skills trainer who witnessed the March 10 incident, as well as Ebisui's expert opinion based on descriptions of the incident, support Plaintiffs' contention that both the Mokulele plan and the Defendants' use of restraint during

15

the incident were improper given R.K.'s disability and that the restraint used was more than necessary to protect R.K. from injury. Thus Plaintiffs have raised genuine issues of material fact as to whether HDOE denied R.K. meaningful access to the benefits of a public education by denying her a reasonable accommodation.[1]

### 2. Deliberate Indifference

To show deliberate indifference, Plaintiffs must show that HDOE knew that a harm to a federally protected right was substantially likely and failed to act upon that likelihood. *See Hamamoto*, 620 F.3d at 1099. A plaintiff may meet this test by showing that a defendant knew a particular accommodation was needed yet failed to investigate whether the accommodation was reasonable. *Id*.

Plaintiffs have also raised genuine issues of material fact on these points. It is uncontested that Mokulele and HDOE knew that R.K. needed specialized autism services and that R.K.'s Individualized Education Plan required implementation of a behavioral support plan. Evidence that Trumpet had included the subject accommodation in its behavioral support and crisis plans and that Trumpet had provided its plans to Mokulele supports Plaintiffs' position that HDOE knew that R.K. needed this specific accommodation because of her autism.

---

[1] Because Plaintiffs' evidence of a § 504 violation is sufficient to overcome Defendant Matayoshi's motion as to count one of the complaint, the court does not address allegations, if any, arising under § 504 regulations. *See Hamamoto*, 620 F.3d at 1101-02.

Finally, evidence that Mokulele did not seek input from Trumpet about its behavioral support and crisis plans or seek the input of other professionals or Kimes regarding the use of restraint with R.K. is sufficient to raise a genuine issue of material fact as to whether Matayoshi failed to act upon a likelihood of harm to a federally protected right.

## B. Section 504 Claims Against Defendants Nakamoto, Tovey, and Carlson in their Official and Individual Capacities

In counts one and two of their complaint, Plaintiffs have alleged violations of § 504 by Nakamoto, Tovey, and Carlson in both their official and individual capacities. Compl. at ¶¶ 47-52. Defendants contend that the claims against these defendants in their official capacities are merely duplicative of the claim against Matayoshi in her official capacity and argue that there can be no individual liability under § 504. Mot. at 9-10. Plaintiffs conceded at oral argument that the individual-capacity claims should be dismissed.

"[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against an entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). In this case, the real party in interest is the HDOE. Although Plaintiffs have not named HDOE as a defendant, the court treats Plaintiffs' claim against Matayoshi as Superintendent of HDOE as a suit against that entity, and finds Plaintiffs' claims against Nakamoto, Tovey, and Carlson in their official capacities are merely duplicative of that claim. *See Ricks v. Matayoshi*, 2017 WL 1025170, at *5 (D.

Haw. Mar. 16, 2017) (dismissing claims against employees of the Hawaii Department of Education as "duplicative of the Rehabilitation Act claim against Defendant Matayoshi in her official capacity as Superintendent of the State of Hawaii Department of Education."); *Carnell v. Crimm*, 872 F. Supp. 746, 752 (D. Haw. 1994) (dismissing claims against police officers, finding "[a] suit against a law enforcement official in his official capacity generally represents merely another way of pleading the action against the entity of which the official is an agent"). Therefore, Defendants Nakamoto, Tovey, and Carlson are entitled to summary judgment in their favor on counts one and two of the complaint.

**C.     Tort Claims**

Defendants Nakamoto and Tovey contend that they are entitled to summary judgment on count three of the complaint, allegations of assault and battery against those defendants only, and all defendants contend they are entitled to summary judgment on count four, negligent infliction of emotional distress, based on both a lack of evidence and the doctrine of qualified immunity. Because the court finds the Defendants are immune as a matter of law, it does not address the evidentiary support for these claims.

Nonjudicial government officials are immune from tort liability unless an injured party demonstrates by clear and convincing evidence that the officials were "motivated by malice and not by an otherwise proper purpose." *Towse v.*

*State*, 64 Haw. 624, 632 (1982); *see also Awakuni v. Awana*, 115 Haw. 126, 140 (2007); *Medeiros v. Kondo*, 55 Haw. 499, 504-05 (1974).  Hawaii courts define "malice" as the "intent, without justification or excuse, to commit a wrongful act," "reckless disregard of the law or of a person's legal rights," and "ill will" or "wickedness of heart."  *Awakuni*, 115 Haw. at 140-41.

In their opposition to Defendants' motion, Plaintiffs acknowledge their burden to put forth evidence of malice in order to overcome the conditional privilege, but they have pointed to nothing that would support a finding by clear and convincing evidence that any of the defendants acted with malice.  Rather, they conflate "malice" in this context with "deliberate indifference" in the context of their § 504 claims, and they offer in support of their tort claims only their argument under § 504 that Defendants acted with deliberate indifference—a different standard requiring a different burden of proof.  Thus, Plaintiffs have not met their burden of showing sufficient evidence to establish an essential element of their tort claims.  *See Broussard*, 192 F.3d at 1258; *Taylor*, 880 F.2d at 1045.

## V. **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.  On count one of the Complaint, Judgment is GRANTED in favor of Defendants Nakamoto, Tovey, and Carlson on all counts of the complaint.  Judgment is DENIED as to Matayoshi on

19

count one of the complaint, but is GRANTED as to her on all other counts to the extent they are alleged against her.

Remaining is Plaintiffs' claim against Matayoshi in her official capacity for violation of § 504.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, 16 October, 2017.



    /s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Kimes v. Matayoshi*, Civ. No. 16-00264 JMS-RLP; Order Granting in Part and Denying in Part Defendants Kathryn Matayoshi, Nicole Carlson, Bart Nakamoto, and Peter Tovey's Motion for Summary Judgment, ECF No. 29